

# SEALED

Office of the United States Attorney
District of Nevada
501 Las Vegas Boulevard, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336

CHRISTOPHER CHIOU
Acting United States Attorney
Nevada Bar No. 14853
NICHOLAS D. DICKINSON
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Nicholas.dickinson@usdoj.gov

JOHN C. DEMERS
Assistant Attorney General
National Security Division
MATTHEW J. MCKENZIE
Trial Attorney
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-7845
Matthew.mckenzie@usdoj.gov
*Attorneys for the United States*

FILED / ENTERED / RECEIVED / SERVED ON
COUNSEL/PARTIES OF RECORD
MAY 19 2021
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TINA CHEN,<br>   aka "Ya When Chen,"<br>   aka "Wen Tina Chen,"<br>   aka "Tina Dunbar,"<br>   aka "Tina Dubner,"<br><br>Defendant. | SEALED<br>CRIMINAL INDICTMENT<br><br>Case No.: 2:21-cr-139 APG BNW<br><br><u>VIOLATIONS:</u><br><br>50 U.S.C. § 1705<br>(International Emergency Economic Powers Act)<br><br>31 C.F.R. Part 560<br>(Iranian Transactions and Sanctions Regulations)<br><br>18 U.S.C. § 981(a)(1)(C)<br>28 U.S.C. § 2461(c)<br>(Criminal Forfeiture) |

THE GRAND JURY CHARGES THAT

## INTRODUCTORY ALLEGATIONS

At all times material to this indictment:

*The International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations*

1. The International Emergency Economic Powers Act ("IEEPA") authorizes the President of the United States to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States," by declaring national emergencies with respect to such threats. 50 U.S.C. § 1701(a). Since 1979, and through the present day, U.S. presidents have repeatedly declared that the actions and policies of the Government of Iran ("GOI") pose a threat to the United States' national security including, among other actions, the GOI's pursuit of nuclear weapons and its sponsorship of terrorism.

2. Since 1979, the United States has adopted a series of statues, executive orders, and regulations designed to check the national security threat posed by GOI's policies and actions, including the Iranian Transactions and Sanctions Regulations ("ITSR"). 31 C.F.R. part 560. The ITSR target, among other things, exports from the United States or by U.S. persons for the benefit of Iran.

3. The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy, or economy of the United States. OFAC issued the ITSR.

4. Without a license from OFAC, the ITSR prohibit the following:

   a. "The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204.

   b. "The reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States" if undertaken with knowledge that the reexportation is intended specifically for Iran or the GOI. *Id.* § 560.205

   c. "Any transaction on or after the effective date [meaning 1979] that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited," and that "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part is prohibited." *Id.* § 560.203.

5. Pursuant to IEEPA, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition under this title." 50 U.S.C. § 1705(a). IEEPA also provides a criminal penalty for anyone who, among other things, willfully conspires to commit any of the unlawful acts described in § 1705(a). *See id.* § 1705(c).

*Defendant and Her Business*

6. Defendant Tina Chen ("CHEN") is a United States citizen who lives in Las Vegas, Nevada.

7. CHEN owns Top One Zone, LLC, a company that exports electronic and computer components. Top One Zone's website (www.top1zone.com) states that "Top One Zone is a US-based Global Sourcing & Contract Manufacturer Trading Company that makes working with offshore manufacturing easy and risk-free. We have over 10 years of experience in sourcing, quality inspection, auditing, engineering, manufacturing, and packaging. We have co-operated and developed long term relationships through our Asia and the Pacific Rim reliable Factories. Our business model is to find better sources of supply around the world, offering improved quality and lower prices."

8. CHEN operates Top One Zone out of her Las Vegas residence.

9. At no time did CHEN or Top One Zone, ever apply for, or receive a license from OFAC to export any goods from the United States to Iran.

## COUNT ONE
Conspiracy to Unlawfully Export Goods to Iran

10. Paragraphs 1 through 9 above are incorporated and realleged as if fully set forth here. Beginning at a date unknown to the Grand Jury, but no later than in or about November 2015, and continuing through a date unknown to the Grand jury, but to at least in or about May 2019, in the State and Federal District of Nevada and elsewhere,

TINA CHEN,
aka "Ya When Chen,"
aka "Wen Tina Chen,"
aka "Tina Dunbar,"
aka "Tina Dubner,"

and others known and unknown to the Grand Jury, knowingly combined, conspired, confederated, and agreed to willfully export and cause the exportation of goods from the United States to Iran in violation of the prohibitions imposed upon that country by the United States government, without first having obtained the required licenses from OFAC

1  in violation of Title 50, United States Code, Section 1705 (IEEPA) and Title 31, Code of
2  Federal Regulations, Parts 560.203 and 560.204 (ITSR).

### OBJECTS OF THE CONSPIRCY

11. The objects of the conspiracy were:

   a. to acquire goods from the United States in order to supply those goods to entities and end users in Iran;

   b. to conceal from United States companies, and the Unites States government that the goods were destined for end users in Iran;

   c. to engage in financial transactions to facilitate the exports;

   d. to evade IEEPA and the ITSR's regulations, prohibitions, and licensing requirements.

### MANNER AND MEANS OF THE CONSPIRCY

12. CHEN and her coconspirators used email to communicate with one another.

13. CHEN and her coconspirators purchased goods from companies in the United States that were sent to CHEN's residence.

14. CHEN and her coconspirators concealed from United States companies the true nature of the ultimate end use and true identities of the ultimate end users of the goods, by providing false and misleading information about ultimate end uses and end users.

15. CHEN and her coconspirators caused goods to be exported from the United States to individuals and entities located in Iran through Hong Kong, without obtaining a license from OFAC.

## OVERT ACTS

16. In furtherance of this conspiracy and to accomplish its objects, defendant and others known and unknown to the Grand Jury, committed various overt acts within the District of Nevada and elsewhere, including but not limited to the following:

*March 25, 2016 Export*

17. On or about February 25, 2016, coconspirator 1 emailed CHEN the following:

> Also please pay attention that every when you want to send any goods to me, consider below note: 1-Don't put real invoice ever 2-Put Packing List 3-If possible for you Put Fake invoice with low cost such as 50$ (under 100$) 4-Don't write your company's detail on parcel, only write Sender name and number for in case of Emergency follow or post tracking.

18. On or about February 29, 2016, coconspirator 1 emailed CHEN asking for a price quote on a photomultiplier and two bandpass filters.

19. On or about March 1, 2016, CHEN emailed coconspirator 1 providing the requested prices quotes. Coconspirator 1 replied that the items were for his friend at the university and asked CHEN to "check that all item[s are] available and haven't any problem for buying. (End user)."

20. On or about March 15, 2016, CHEN purchased the parts from a U.S. company and had the parts shipped to her house.

21. On or about March 16, 2016, CHEN emailed coconspirator 1 and asked, "Can you please let me know which university is going to use those parts?" Coconspirator 1 replied, "Zanjan university(www.znu.ir) wants it but can't say it for supplier because it's an Iranian university."

22. On or about March 22, 2016, CHEN emailed coconspirator 1 a Top One Zone invoice for the photomultiplier and two bandpass filters totaling $2,823.70.

23. On or about March 25, 2016, CHEN shipped the photomultiplier and two bandpass filters to Company 1 in Hong Kong. CHEN described the items as samples of components with a declared value of $58.

*May 25, 2016 Export*

24. From on or about May 2, 2016 through on or about May 19, 2016, CHEN made eight purchases of electronic goods from U.S. companies to fulfil orders from coconspirator 1.

26. On or about May 17, 2016, coconspirator 1 emailed defendant and stated, "[I] was declared to customer delivery time to [I]ran is 4-5 Week."

27. On or about May 18, 2016, defendant submitted a Customer End-User Certificate to a U.S. Company that falsely stated that defendant was purchasing goods for export to end user Hong Kong University of Science and Technology and falsely certified that the purchased goods would not be sold to a restricted country without obtaining the required government approval.

28. On or about May 19, 2016, defendant submitted a revised Customer End-User Certificate to a U.S. Company that falsely stated that the goods purchased would be used for a startup application in Hong Kong and falsely certified that the purchased goods would not be sold to a restricted country without obtaining the required government approval.

29. On or about May 24, 2016, coconspirator 1 emailed defendant instructing her to repackage the goods and to remove the original manufacture's name, and any sensitive labels and to ship the goods to company 2 in Hong Kong. Coconspirator 1 also instructed CHEN to declare the goods as "Professional Gaming Workstation" and "Electronic components" with a declared value of around $1500.

30. On or about May 24, 2016, CHEN replied to coconspirator 1 via email stating that she needed to charge more for repackaging the good and that coconspirator 1's proposed declared value was too low. Specifically, CHEN stated: "[T]he total pricing you requested is too less. I've received a letter from [the shipping company] regarding for the commercial invoice amount. I did give a good explanation last time but I cannot take any risk so from now on, I will use 25% out purchasing price on the fake invoice. Such as if we purchase $1. – then the fake invoice will be $.25"

31. On or about May 25, 2016, CHEN shipped these goods to Company 2 in Hong Kong. CHEN described the items as "professional gaming workstation and Electronic components," with a declared value of $3,150.

*July 2016 Export*

32. On or about June 25, 2016, coconspirator 1 sent CHEN instructions for the export of electronic components. As part of the instructions, coconspirator 1 provided what coconspirator 1 described as a "fake end user" and instructed CHEN to say that the items were for "Audiovisual Electronic Equipment, Electronics LTD Corp. in Turkey." -

33. On or about July 6, 2016, CHEN shipped electronic components to Company 2 in Hong Kong. CHEN described the items as electronic components with a declared value of $675.

*Notice*

34. On or about November 10, 2016, Special Agents with the Federal Bureau of Investigation and with the United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE"), visited CHEN at her residence and place of business in Las Vegas, Nevada. The purpose of the visit was to discuss with CHEN the regulations and limitation ns regarding the export of United States

8

commodities. Even after they announced the reason for their visit, CHEN refused to speak to the agents.

35. Thereafter, an OEE Special Agent ("SA") exchanged multiple emails with CHEN. In November 2016, an OEE SA provided CHEN an OEE outreach packet via email, which contained information regarding the responsibilities of exporters and freight forwarders when conducting exports, denied parties lists, sanctioned countries, and record-keeping requirements.

36. On or about November 29, 2016, CHEN made the following statements to the OEE SA regarding Top One Zone's business practices, saying she:

    a. exports to Hong Kong;

    b. exports resistors, transistors, encoders and measurement equipment;

    c. exports to Company 2 in Hong Kong;

    d. does not export to Iran or Syria;

    e. does not file EEIs because "the client is only request small quantities and they are not in big amount. Normally only cost few hundred dollars"; and

    f. has her customer fill out End-User Certificates "especially, when the supplier do ask one to fill out."

37. On or about November 29, 2016, the OEE SA replied to CHEN's email, informing defendant that if defendant is shipping to a company in Hong Kong, it is her responsibility to know if the Hong Kong company is re-exporting the goods to another country. Defendant replied: "I do ask [Company 2], and they told me those parts are for local industrial, Automotive & University research use."

38. In email sent on or about November 29, 2016, CHEN made the following additional statements to the OEE SA:

a. "I am doing import most of the time"; and

b. "I know no one in North Korea, South Sudan, Syria, and Iran and have no business relationship with those countries."

*Additional Exports*

39. CHEN continued to export items to coconspirator 1 after being contacted by OEE. For example, on or about February 7, 2017, CHEN emailed coconspirator 1 and asked where he/she would like to have items costing over $14,000 shipped. Coconspirator 1 instructed CHEN to "check new address in [Hong Kong]," provided the company's name, and said that Company 3's nature was trading so that "if they check that no problem."

40. On or about February 16, 2017, CHEN shipped the items to Company 3 in Hong Kong. CHEN described the items as electronic components with a declared value of $300.

## FORFEITURE ALLEGATION
Title 18, United States Code, Section 981(a)(1)(C) and Title 28,
United States Code, Section 2461(c)

1. Upon conviction of a specified unlawful activity, including Title 50, United States Code, Section 1705, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. The United States will also seek a forfeiture money judgment against the defendant, which represents a sum of money equal to the value of any property subject to forfeiture in connection with the offense of conviction.

3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property that cannot be subdivided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1); and Title 28, United States Code, Section 2461(c).

**DATED:** this 19th day of May, 2021.

**A TRUE BILL:**

/S/
FOREPERSON OF THE GRAND JURY

CHRISTOPHER CHIOU
Acting United States Attorney

By_____
NICHOLAS D. DICKINSON
Assistant United States Attorney


JOHN C. DEMERS
Assistant Attorney General
National Security Division

MATTHEW J. MCKENZIE
Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA